**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. _____**

| | |
|---|---|
| JERRY DEAN SIMMONS,<br><br>                    Plaintiff,<br><br>v.<br><br>WILLIAM CAREY COOPER in his individual capacity and official capacity as North Carolina Probation and Parole Officer,<br><br>                    Defendant | **COMPLAINT**<br>**(Jury Trial Demanded)** |

NOW COMES Plaintiff, JERRY DEAN SIMMONS, by and through counsel, and complaining of Defendant, alleges and says:

**I.   PARTIES, JURISDICTION AND VENUE, AND NATURE OF CASE.**

1.   Plaintiff, Jerry Dean Simmons (hereinafter "Mr. Simmons"), is a citizen and resident of Johnston County, North Carolina.

2.   Upon information and belief, Defendant, William Carey Cooper (hereinafter "Defendant Cooper"), is a resident of Johnston County, North Carolina.

3.   At all times relevant to this action, Defendant Cooper was employed as a Probation and Parole Officer by the State of North Carolina, under the North Carolina Department of Public Safety, stationed in Johnston County.

4.   On the evening of December 12, 2019, Defendant Cooper, shot and gravely injured Mr. Simmons at the Simmons' private residence, located at 4607 Antioch Church Road, Middlesex, North Carolina.  In doing so, Defendant violated Plaintiff's constitutional rights to be free from excessive force and the unjustified use of deadly force.

5.   Mr. Simmons brings this civil action under 42 U.S.C. § 1983 for acts committed by Defendant under color of state law that deprived Mr. Simmons of his rights under the Fourth

Amendment of the United States Constitution, incorporated by the Fourteen Amendment of the United States Constitution.

6. Mr. Simmons' action arises under the Constitution and laws of the United States. This Court has original jurisdiction over Mr. Simmons's federal claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

7. All material events giving rise to this cause of action occurred in Johnston County, North Carolina.

8. Under 28 U.S.C. § 1391(b) venue is proper in the United District Court for the Eastern District of North Carolina, Western Division, as both Plaintiff and Defendant reside in Johnston County, and a substantial number of events relevant to this action occurred in Johnston County.

## II. FACTS.

All of the above and foregoing allegations in this Complaint are made upon good faith information and belief.

9. Jerry "Dean" Simmons, Plaintiff, presently and at all times relevant to this complaint, lived with his wife, Leslie Simmons, and son in their home located at 4607 Antioch Church Road (hereinafter "Simmons Residence") in Johnston County North Carolina, which had been owned by the Simmons family since 1997.

10. The Simmons Residence and their surrounding private property are located immediately off of Antioch Church Road and are accessed by a driveway. The private drive allows access to not only the Simmons Residence, which is the first home on the drive, but also to multiple trailers further down the private driveway that Mr. Simmons rents out to the residents who live in said trailers. The Simmons Residence and each of the trailer residences on the private drive have different, numbered addresses assigned to them. Each trailer has its own individual mailbox located at the corner of Antioch Church Road and the entrance of the private drive.

11. The Simmons Residence is just under 200 feet away from Antioch Church Road. It is a beautiful and large home, with an expansive and well-kept front yard. It has a porch facing the road, as well as a porch equipped with a wheelchair ramp that extends to the Simmons' parking area.

12. Any reasonable law enforcement officer or visitor to the Simmons Residence in the evening or nighttime hours when the Simmons family cars are parked in their parking area, as the Defendant did on the evening in question, would know or should know immediately by looking at the property that the main entryway to the house is not the front porch area but is instead the side entrance that not only leads directly to the Simmons' parking area but is also the entrance that is equipped with the Plaintiff's wheelchair ramp and an overhead light is turned on at night time hours.

13. Plaintiff Simmons has been wheelchair-bound since 2008 following serious medical complications affecting his cerebellar functions. He suffers from a cerebellar neurological disorder that disrupts his balance and ability to walk forcing him to rely on a wheelchair for mobility. Mr. Simmons also manages other health complications including a previous heart attack that requires him to have a defibrillator as well as reduced vision in his right eye. When seated in his wheelchair, Mr. Simmons measures 4' 2" in stature and weighs roughly 190 lbs.

14. In addition, Plaintiff Simmons suffers from partial hearing loss. On December 9, 2019, a few days prior to the encounter at issue in this claim, Mr. Simmons was prescribed hearing aids to combat his hearing loss, which he was in the process of acquiring at the time of the encounter but had not yet received.

15. Mr. Simmons has lived in North Carolina his entire life and has never been arrested or charged with a crime.

16. On December 12, 2019, upon information and belief, Defendant Cooper was working the second shift, from 1:00 p.m. until 10:00 p.m., as a Probation and Parole Officer assigned in Johnston County, North Carolina.

17. Defendant had spent his shift making home visits and at some point, decided he would make a home visit to a new individual on probation he had never met before named Holly Daniels. Ms. Daniels had previously been assigned to a different probation officer and she had never interacted with or seen Defendant Cooper before. Ms. Daniels had only been recently re-assigned to Defendant Cooper's case list roughly two months prior to this incident.

18. Importantly, prior to December 12, 2019, Defendant Cooper had never met with Holly Daniels, he had never seen her in person, he had never attempted to meet with her, he had never visited or attempted to visit her at her home address, and he had never done anything to educate himself on what type of home she lived in, what her home looked like, or where he could find her residence off of Antioch Church Road if he attempted to go there for a home meeting.

19. At roughly 7:20 p.m. on December 12, 2019, Defendant began driving to Ms. Daniel's listed address of 4615 Antioch Church Rd. Defendant Cooper had never been to the individual's address or the area around the address before deciding to initiate a home check of an individual he had never met.

20. Defendant Cooper made the dangerous decision to make a surprise home visit to Ms. Daniels' residence at night without calling her beforehand and despite the fact that he had never met her, never seen her, never been to her address, did not know what type of home she lived in, and did not know the Antioch Church Road area or what persons lived in the various residences along this private driveway.

21. At all times relevant when Defendant Cooper approached Antioch Church Road and then had his interactions on Plaintiff's property that resulted in Defendant shooting Plaintiff Simmons, it was nighttime and dark outside.

22. Upon information and belief, Defendant used GPS directions from an application on his phone that directed him to Antioch Church Road and the entrance of the private driveway described above. There, before turning onto the private drive, Defendant saw multiple mailboxes

and confirmed that one of the mailboxes was for 4615 Antioch Church Road by illuminating it with his flashlight.

23. Before turning down the private drive, Defendant knew or should have known that multiple private residences could be accessed by using this single private drive.

24. Defendant knew or should have known that he needed to drive the entire length of the private drive and make a reasonable effort to determine which home or trailer was the location where Ms. Daniels actually lived before stopping his car and getting out to surreptitiously approach any individual's home and surrounding curtilage at night on foot.

25. Defendant knew or should have known that his conduct would likely create fear in residents who may become aware of Defendant's presence and believe him to be an unlawful intruder who is posing a threat or danger to the residents and/or their private property at night when it is dark and visibility is greatly reduced.

26. Defendant knew or should have known that his conduct would scare residents in the area if he approached their homes in this manner at night and create the foreseeable risk that one or more of the residents may believe it was necessary to defend themselves or their homes with either the use of force or the threatened use of force in an effort to make an intruder leave.

27. Before turning down the private drive, Defendant could see that it was a long drive with multiple residences, the first being the large and beautiful Simmons Residence property. Instead of driving down the length of the drive and properly determining which residence likely belonged to probationer Ms. Daniels, Defendant Cooper negligently and recklessly chose to park his car blocked from view near the Simmons home, to get out and approach the unlit front porch area of the home surreptitiously and on foot.

28. Defendant Cooper chose to park his vehicle directly behind the two large SUVs in the Simmons' parking area that were both parked at the base of the wheelchair ramp, a tan Ford Expedition, and a white Volvo XC-90. These large vehicles obstructed any view of Defendant Cooper's car from the point of view of a person in the Simmons home who may try to look out

from the side door or windows in that area to see who might be outside and on their private property at night.

29. Defendant Cooper knew or should have known that parking his car in this location would make it difficult for people in the Simmons' home to see his car or identify any information that might have been displayed on his car and that doing so increased the risk and made it even more foreseeable that his unannounced and surreptitious movements around the private yard and front porch of the home would scare the residents inside and one or more of the residents may believe it was necessary to defend themselves or their homes with either the use of force or the threatened use of force in an effort to make an intruder leave.

30. Defendant Cooper then exited his car and instead of reasonably going to the illuminated side entrance of the home where he could be clearly seen by any resident inside—which was also the obvious main entryway of the home, the only entrance prominently facing the Simmons' parking area and the closest entrance to where Defendant himself parked, the entrance for which the Simmons kept an outside light on, the entrance that the Simmons had decorated with seasonal Christmas decorations, and the only entrance that was equipped with Plaintiff Simmons' wheelchair ramp—Defendant instead unreasonably and dangerously chose to walk surreptitiously across the Plaintiff's front yard area and stealthily walk onto Plaintiff's front porch that was totally unilluminated by light so he could not be seen or heard by the residents inside.

31. At all times relevant to this incident, Defendant was wearing a black fleece pullover and a dark blue vest, making him difficult to see in the dark.

32. At this same time of evening, Mr. Simmons and his wife, Leslie Simmons, were sitting in their home relaxing in a room located at the rear of the residence, which had also been decorated for the Christmas season. Their son, who was fourteen (14) years old at the time of the encounter, had gone up to his upstairs bedroom sometime around 7:30 p.m. Mr. Simmons, who uses his wheelchair both inside and outside the home, and just finished making a batch of sausage balls in the kitchen which his family enjoyed during the Christmas season.

33. Sometime shortly before 8:30 p.m., the Simmons family dogs began to bark and signal their concern of something they sensed just outside the home. Leslie Simmons looked out from the room in which they were sitting toward the front door/entryway of the home and to her shock and terror, she saw someone shining a flashlight into their home through the windows of the front porch area. This was in fact Defendant Cooper who had negligently and dangerously chosen to surreptitiously walk up onto Plaintiff's unlit front porch without being seen or heard, and he then began shinning his flashlight in through the front porch windows of the home.

34. Prior to this incident, the Simmons Residence has been the victim of multiple intruders at nighttime who have stolen valuable property such as a vehicle.

35. Being very scared at what was happening, and believing one or more unlawful intruders were on the front porch possibly getting ready to attempt entry into the home, Leslie Simmons called to her husband to alert him of this information. This caused Plaintiff Simmons to also become justifiably scared and worried that his home and family were in potential danger from one or more unlawful intruders.

36. Mrs. Simmons went to the front door and without opening it she attempted to look through the side panel window of the door. She was unable to see anyone at the door, so she turned on the porch light to hopefully scare the intruder(s) away and/or get a visual of who was outside their home at night.

37. Mr. Simmons, in his wheelchair, went to the main side door entrance of the home because that is where his wheelchair ramp access was located. He opened the door and as he rolled out just far enough for his front wheels to pass the threshold, Mr. Simmons looked out into his yard which was not visible to him in the dark. Plaintiff Simmons did not feel comfortable going out any further at that time because he could not see into the dark yard and he did not have his pistol for protection. Instead, he called out "Who is this? What do you want?" Plaintiff Simmons heard no answer to these questions.

38. Unable to see the trespasser, Mr. Simmons shouted out again, "You need to leave—you don't belong here at this time of night. You need to leave." Not seeing the trespasser leave, Mr. Simmons then navigated his manual wheelchair back into the house to retrieve his handgun from inside a cabinet drawer near the side entryway. Leaving the pistol in its holster, he placed the holstered gun in his lap, not in his hands (which he needed to move his wheelchair), and returned to the side porch using his hands to maneuver his wheelchair.

39. At roughly the same time, Mrs. Simmons cracked open the front door and called out to see if anyone was there. By this time, Defendant Cooper had moved down to the bottom of the front porch steps but had still positioned himself near the base of the front porch and inside the Simmons front yard area just feet away from the front of their home. This spot was still many feet from the side porch entrance and was not visible to Plaintiff Simmons from his spot in his wheelchair at the threshold of the side entryway. When Mrs. Simmons called out to see who the trespasser was, it was only then that Defendant Cooper said to her that he was a probation officer.

40. At no time prior to Defendant Cooper firing his gun at Plaintiff Simmons did Plaintiff Simmons hear or see that Defendant Cooper was a probation officer, nor did Plaintiff Simmons know or have reason to know that Defendant Cooper was a law enforcement officer of any kind. At all times relevant, Plaintiff justifiably believed that Defendant Cooper was an unlawful intruder at his home who posed a potential threat and who was refusing to listen to his commands to leave.

41. At all times relevant, Defendant Cooper knew or should have known that Plaintiff Simmons was not aware and did not hear, see, or otherwise realize that Cooper was a law enforcement officer. At all times relevant, it should and would have been apparent to any reasonable officer in Defendant Cooper's circumstances that Plaintiff Simmons did not hear, see, or otherwise know or realize that Defendant Cooper was a law enforcement officer, and instead that Plaintiff Simmons had a perfectly rational justification for attempting to investigate and

defend his home from an unknown trespasser at night by having with him a firearm in his possession.

42. Confused at hearing that the Defendant was a probation officer, Mrs. Simmons then opened the door further and asked Defendant Cooper why in the world he was at the Simmons' home as none of them were on probation or criminals of any kind. Defendant then said to Mrs. Simmons that he was looking for Holly Daniels. Recognizing the name as one of the persons who lived in a trailer further down the private drive, Mrs. Simmons immediately told Defendant Cooper that he was at the completely wrong address, that Holly Daniels did not live there, and she was a woman that lived further down the road.

43. As Mrs. Simmons was speaking to the Defendant Cooper as described above, Mr. Simmons did not hear any of this information. Instead, he was using a wheelchair to return from retrieving his pistol inside the home and then guiding his wheelchair out of the side door, across the threshold, and out onto the wheelchair ramp. He then maneuvered his wheelchair down the ramp, with his gun remaining inside the holster and laying on his lap and not in his hands, the entire time.

44. Mrs. Simmons then attempted to call over from her location on the front porch to where she believed her husband was moving on the wheelchair ramp, in an effort to try and tell him that the trespasser was actually a probation officer. At this time, rather than remain safely near Mrs. Simmons where he could continue to speak with her and be illuminated by the front porch area so that he could be clearly seen, Defendant Cooper made the dangerous and negligently decision to instead move himself further out into the Simmons' large front yard and use the cover of darkness and the trees located in the yard to further obscure himself from Plaintiff Simmons' view.

45. At no time prior to Defendant Cooper firing his gun at Plaintiff did Plaintiff Simmons hear or understand his wife attempting to inform him that the trespasser was actually a probation or law enforcement officer of any kind. At all times relevant, it should and would have

been apparent to any reasonable officer in Defendant Cooper's circumstances that Plaintiff Simmons did not hear his wife and did not realize that Cooper was a law enforcement officer, but instead that Plaintiff Simmons had a perfectly rational justification for attempting to investigate and defend his home from an unknown trespasser at night by having with him a firearm in his possession.

46. When Mr. Simmons reached the end of the ramp, he still honestly and reasonably believed Defendant Cooper was an unlawful intruder, refusing to leave, who posed a significant potential threat of imminent harm to his family and himself. As Mr. Simmons tried to look out into the dark yard, he saw the trespasser's shadowy figure running from the front porch landing area to a pumphouse structure that was located many feet away into the dark yard. Mr. Simmons again yelled at the trespasser making it clear he had no idea who this trespasser was and using strong language commanding him to get off of his property in hopes that doing so would finally make the intruder go away and keep his family and property safe. The entire time, Mr. Simmons remained on the end his wheelchair ramp, illuminated by the side porch lights and an overhead streetlight above the parking area, where he could be seen by Defendant Cooper but where Plaintiff could not safely see Cooper.

47. At or about this time, the Simmons' fourteen-year-old son, hearing the commotion and yelling, came to the side door to see what was happening with his father. Plaintiff Simmons yelled out again to the believed trespasser, again telling the individual to identify himself, but neither Plaintiff Simmons nor his son heard Cooper respond. At this time again, it should and would have been apparent to any reasonable officer in Defendant Cooper's circumstances that Plaintiff Simmons did not know or realize that Cooper was a law enforcement officer, but instead that Plaintiff Simmons had a perfectly rational justification for attempting to investigate and defend his home from an unknown trespasser at night by having with him a firearm in his possession.

Page **10** of **17**

Case 5:22-cv-00113-M   Document 5   Filed 03/25/22   Page 10 of 17

48. Suddenly, and without Plaintiff hearing any type of warning, Defendant Cooper fired multiple gunshots at Plaintiff Simmons from the location where he was hiding near the pump house many feet away. Mr. Simmons tried to take cover but being bound to his wheelchair meant he had to use his hands to maneuver the chair. As such, he could not and did not pull out or hold his own pistol in his hand to try and return any fire. After a pause, during which time Mr. Simmons did not aim his gun or attempt to return any fire, Defendant Cooper again fired his gun at Mr. Simmons multiple times. Defendant Cooper's bullets hit the Plaintiff's Ford Expedition windshield and headlight, and one bullet hit Mr. Simmons in his left leg.

49. The shot hitting Plaintiff tore a hole open in Mr. Simmons' left calf as bullet fragments were dispersed across the wound. The wound immediately began to bleed heavily, causing Mr. Simmons excruciating pain as it ripped through his nerves.

50. As he desperately tried to move out of the line of fire and not be killed, the gun that was still in its holster fell from Plaintiff Simmons' lap and landed on the ground. Horrified and distressed to see his injured father being fired upon, the Simmons' son rushed down the wheelchair ramp to help try and save his father's life by moving behind the Ford Expedition. Defendant Cooper's barrage of shots only ended as they took cover behind the SUV.

51. Defendant shot a total of nine times at the wheelchair-bound Plaintiff even though Plaintiff had never attempted to return any fire. At no time did Plaintiff aim his pistol at Defendant Cooper or at any other person during this encounter.

52. Even if Plaintiff had tried to use his gun to point in Defendant Cooper's direction, at all times relevant, it should and would have been apparent to any reasonable officer in Defendant Cooper's circumstances that Plaintiff Simmons had a perfectly rational justification for attempting to investigate and defend his home from an unknown trespasser at night by having with him a firearm in his possession, and pointing his gun at said unknown trespasser who Plaintiff believed was refusing to leave and posed a potentially serious threat.

53. At no time during the encounter did Plaintiff Simmons point a firearm or other weapon at Defendant Cooper or threaten harm to any other individual.

54. At all times during the encounter, Plaintiff Simmons was acting justifiably and within his rights to try and defend his home from a person he reasonably believed was an unlawful intruder at night who was refusing to leave the Simmons' private residential property and who posed an imminent threat of serious harm to himself and his family.

55. Defendant is and was at all times relevant to this claim, an employee of the North Carolina Department of Public Safety.

56. Under the US Constitution and prevailing federal law, a reasonable officer is only entitled to use deadly force when and where the officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or to others.

57. Under the US Constitution and prevailing federal law, mere possession of a firearm by a suspect is not enough to permit the use of deadly force. The objective basis of the threat must be real, regardless of whether a gun is actually present.

58. Under the US Constitution and prevailing federal law, an individual may reasonably bear a legally owned firearm while investigating a nocturnal disturbance on his or her private residential property.

59. Under the US Constitution and prevailing federal law, an individual may reasonably bear a firearm while investigating a nocturnal disturbance on his or her private residential property, particularly if a reasonable law enforcement officer would conclude that the greeting party was unaware that the disturbance was law enforcement.

60. A reasonable officer is not permitted to use deadly force when they know or should know that a homeowner or resident has a justified and rational reason for holding or using a firearm to try and defend their home from whom they believe is an unlawful intruder at night who refuses to leave and who poses a potential threat of harm.

61. According to the North Carolina Probation and Parole Use of Force Policy, Chapter A, Section .1711, probation and parole officers are to only use force "in strict conformance with the United States Constitution, the Constitution and laws of North Carolina," and the policy.

62. Specifically, the policy sets out that an officer is justified in using deadly, physical force upon another person "only when it is or appears to be reasonably necessary to defend himself or a third person from what he or she reasonably believes to be the use or imminent use of deadly force," with the term 'imminent' defined as "synonymous with the term immediate."

63. Under the policy, officers must also give a verbal warning before using lethal force, and an officer "shall never fire warning shots."

64. It was perfectly reasonable for Plaintiff to investigate a nocturnal disturbance at his residence on his property with the use of his personal firearm.

65. An objective and reasonable officer under these circumstances would have understood that Mr. Simmons did not hear or realize that Defendant was a probation officer given Mr. Simmons, an older gentleman in a wheelchair, repeatedly yelled out demanding that Defendant identify himself, to state who he was, to state why he was here, and to command him to leave because he had no right to be there.

66. At no point did Mr. Simmons use or attempt to use deadly force that would have permitted a justified defensive use of force by Defendant Cooper, even after Defendant fired at Mr. Simmons.

67. An objective and reasonable officer, given the facts and circumstances of the situation, would not have used force, and certainly not deadly force, against Plaintiff Simmons as there was no reasonable indication of an immediate threat of serious bodily injury or death posed by Plaintiff Simmons and/or Plaintiff Simmons had a perfectly justified rationale for believing he needed to defend his home and family from an unlawful trespasser who was refusing to obey verbal commands to leave.

68. As a result of Defendant's misconduct, Mr. Simmons' was severely and permanently injured and endured not only the immediate and excruciating pain, medical care, and emotional trauma of the gunshot wound, but also the humiliation of being held at gunpoint, handcuffed, and humiliated in front of multiple third parties as a result.

69. Further, Mr. Simmons's injury, despite constant care and antibiotics, became necrotic which meant that Mr. Simmons had to endure a painful surgical debridement procedure and extended recovery. To this day, Mr. Simmons still suffers from nerve pain related to the injury.

## **FIRST CLAIM FOR RELIEF**

(Civil Rights Violation Under 42 U.S.C. § 1983)

70. Plaintiff incorporates all preceding and forgoing paragraphs by reference as if fully set forth herein.

71. This claim under 42 U.S.C. § 1983 is brought against Defendant Cooper in his individual and official capacity.

72. Defendant Cooper had no legal justification to use force or begin shooting Plaintiff Simmons on Plaintiff's property when Plaintiff came to the end of the ramp. It was clear from Plaintiff's conduct that Plaintiff did not understand that Defendant Cooper was a Probation Officer, and that his wife and son were attempting to communicate that information to Plaintiff at the time Defendant Cooper opened fire from cover.

73. Plaintiff Simmons did not pose an immediate threat to Defendant Cooper that justified the use of force or deadly force. An objectively reasonable officer in Defendant Cooper's circumstances would not have concluded that a threat existed which would justify the use of deadly force against Mr. Simmons.

74. When Plaintiff Simmons did not return fire and his minor son went to assist him, Defendant Cooper had no legal justification for continuing to shoot at Plaintiff Simmons, resulting in grievous injury to Plaintiff Simmons.

75. Defendant Cooper was at all relevant times acting under the color of state law. Defendant was acting as a Parole and Probation Officer of the North Carolina Department of Public Safety.

76. Defendant's conduct was objectively unreasonable under the facts and circumstances then existing. Mr. Simmons did not consent to any of Defendant Cooper's Conduct described herein.

77. At all times relevant, Defendant Cooper had a duty to use reasonable care to properly locate Holly Daniels' address and to conduct his home visit in such a manner so as to not cause unsuspecting homeowners and residents to believe he was an unlawful intruder who posed a potential threat to their safety and property, and not cause individuals to believe it was necessary to take steps to defend themselves by obtaining or using a firearm in defense.

78. Had Defendant approached the clearly marked entrance to the home, the illuminated entrance at the top of the wheelchair ramp, Plaintiff Simmons would not have been prompted to investigate the nocturnal disturbance.

79. Had Defendant remained at the front porch and allowed for Plaintiff's wife to communicate Defendant's presence and mistaken identification to Plaintiff Simmons, the situation would have deescalated, and Plaintiff would have allowed Defendant on the property without further incident.

80. Had Defendant remained in cover behind the pump house structure until Mrs. Simmons spoke with her husband or the Johnston County Police arrived to help clarify Defendants mistaken entrance onto the property, the situation would have deescalated and Plaintiff would have allowed Defendant on the property without a need for Defendant to discharge his firearm.

81. Defendant's misconduct deprived Mr. Simmons of his rights under the Fourth and Fourteenth Amendments of the United States Constitution to be free from excessive force and/or unjustified deadly force.

82. Mr. Simmons' right not to be subjected to excessive and unjustified deadly force was clearly established at the time of Defendant Cooper's actions and misconduct.

83. Defendant Cooper could reasonably foresee that his misconduct could result in bodily injury to Mr. Simmons.

84. As a direct and proximate result of Defendant Cooper's wrongful conduct, Mr. Simmons suffered physical pain, emotional harms, medical treatment, and permanent injury damages in excess of $75,000.00.

85. As a direct and proximate result of Defendant Cooper's willful or wanton conduct, or conduct that demonstrated a reckless and conscious disregard for Mr. Simmons' rights, health, safety, and life, as well as the lives of Mr. Simmons' wife and minor child who were present and in the zone of danger, Mr. Simmons is entitled to recover punitive and exemplary damages to punish Defendant and to deter such conduct by others in an amount later to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court for relief as follows:

1. That Plaintiff Simmons have and recover of Defendant compensatory damages in an amount later to be determined at trial in excess of the jurisdictional limit of this Court for the damages caused to Plaintiff;

2. That Plaintiff Simmons have and recover of Defendant punitive damages in an amount later to be determined at trial and exceeding the jurisdictional limit of this Court for punitive damages;

3. That Plaintiff Simmons have and recover from Defendant special damages in an amount later to be determined at trial and exceeding the jurisdictional limit of this Court for special and exemplary damages;

4. That Plaintiff Simmons have and recover of Defendant reasonable attorneys' fee and expenses to the fullest extent as allowed under U.S.C. § 1988;

5. That Plaintiff Simmons have and recover of Defendant costs of court and interest as allowed by law;

6. That all issues of fact be tried by a jury, and Plaintiff Simmons hereby makes a demand for trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure;

7. That Plaintiff Simmons have and recover such other and further relief, both legal and equitable, which the Court deems just and proper.

Respectfully submitted this the 24th day of March, 2022.

**ZAYTOUN BALLEW & TAYLOR, PLLC**

/s/ Matthew D. Ballew
Matthew D. Ballew (N.C. Bar No. 39515)
Robert E. Zaytoun (N.C. Bar No. 6942)
John R. Taylor (N.C. Bar No. 43248)
3130 Fairhill Drive, Suite 100
Raleigh, NC 27612
(919) 832-6690
(919) 831-4793 (fax)

**SWAIM LAW, PLLC**
Allen Swaim (N.C. Bar No. 36301)
3401 Wendell Blvd. P.O. Box 770
Wendell, NC 27591
Phone: (919) 365-7701
Fax: (919) 366-6770

*Attorneys for Plaintiff Jerry Dean Simmons*